WESTBERRY *v.* THE STATE.

No. 8810. APRIL 12, 1932.

*E. K. Wilcox, F. L. Wilcox, John B. Odum,* and *Copeland & Dukes,* for plaintiff in error.

*G. C. Spurlin, solicitor-general, Lewis C. Russell,* and *E. A. Stephens,* contra.

HILL, J. The grand jury of Lowndes County returned an indictment against Allen Westberry, R. Z. Cheney, Travis Ervin, Austin Westberry, and Homer Padgett, charging them with the murder of Mrs. Hettie Browning. Allen Westberry was put upon trial, March 1, 1931. The jury returned a verdict of guilty, without a recommendation, and he was accordingly sentenced to be electrocuted. He made a motion for new trial on the usual general grounds and 36 additional grounds, all of which were overruled by the court, and the defendant excepted.

The record in the case, which is very voluminous, has been carefully read and studied, as well as the briefs for both the plaintiff in error and the defendant in error. The record makes substantially the following case: Emmett Martin, a negro boy about sixteen years of age, first discovered that Mrs. Browning and her husband had been shot. He immediately hailed a passing automobile, which was driven by T. N. Gamble, and was occupied by himself and Mr. and Mrs. J. L. Cooper. After the car stopped the occupants of the car went inside the building, which was a combination residence and filling-station on the public highway about eight miles south of Valdosta, and there found W. H. Browning, the husband, dead in his chair, having been shot, and Mrs. Browning was in an adjoining room lying on the floor between the bed and the wall, she also having been shot. The Coopers and Gamble at once called

an ambulance from Valdosta and notified certain officers. Mrs. Browning was removed to a hospital in Valdosta, operated by Dr. Bird, within an hour after the shooting. From an inspection of the premises it appeared that Mr. and Mrs. Browning had been shot from the outside of the building through a window-screen, and this was stated by Mrs. Browning to those first reaching her after she was shot. Mrs. Browning lived approximately 24 hours after the shooting, but she seemed to realize from the beginning, and so stated, that she was going to die. She further stated to Mrs. Cooper that after the first two shots were fired, one at her husband and the other at herself, the murderer came inside the house and shot her the second time. Gamble and the Coopers were on their way to Twin Lakes, south of the filling-station, at the time they were stopped by Emmett Martin; and a number of people from Valdosta, about the time of the homicide and immediately thereafter, were on the highway going towards Twin Lakes. Within a short time after the homicide a number of people collected at the filling-station, and the officers who had arrived endeavored to find out who the perpetrator of the crime was, and the crowd remained after midnight. No definite information, however, was ascertained as to who the assassin was. There were no eye-witnesses other than the perpetrators and Mrs. Browning, for apparently Mr. Browning had been killed instantly. The State relied, for conviction, upon certain alleged confessions or admissions and corroborating circumstances, in addition to the dying declarations of Mrs. Browning; also upon the assumption that a conspiracy had been entered into between the five men indicted, to commit this murder for the purpose of robbery. For several days after the homicide the officers of the law were unable to discover anything definite as to who committed the crime, but they did learn that Homer Padgett and Austin Westberry, two of the defendants indicted, one being a nephew and the other a cousin of Allen Westberry, during the same week that Mrs. Browning was murdered, had left the county for some point in Florida. On August 30, 1930, a warrant was sworn out against Austin Westberry and Homer Padgett, charging them with the murder; and W. P. Kendall, chief of police of the City of Valdosta, O. T. Hill, special officer of the Southern Railway Company, and R. D. Myddleton, a county policeman of Lowndes County, went to Manatee, Florida, in order to make the arrest. Padgett

and Austin Westberry were arrested, and returned to Georgia, and placed in the county jail at Quitman. Later Allen Westberry, Cheney, and Travis Ervin, were arrested and placed in jail.

O. T. Hill, testifying for the State, said: "The best I remember, when he was brought to the house he was dressed in a faded blue shirt, overalls, and an old straw hat. I think they were blue overalls and an old straw hat. I have been knowing Allen for fifteen years or more. When he talks and laughs he noticeably displays his teeth. He has several gold teeth, they can be seen when he talks or laughs, and are very noticeable. I heard him talking in the yard and I did not hear anybody ask him any questions. I was present at Thomasville when Austin Westberry was carried there and made a statement with reference to the Browning murder, and Homer Padgett was there, and it was in the afternoon. Austin and Allen Westberry were confronted in the corridor of the jail upstairs. I was present and in a position that I could hear all that was said. Austin walked up in front of Allen Westberry and said: 'Uncle Allen, Homer and I have told all about this thing and told the truth about it, and why don't you do it?' Allen asked him what he was talking about, and he said about him killing the old man and Allen killing the old woman, and Allen Westberry said: 'If you keep telling that kind of lies you are going to put me in the electric chair, and you, too.' Austin said, 'Well, if I go, I will be sitting in the electric chair telling the truth and you will be sitting there with a lie on your lips.' Following that statement Austin Westberry gave the details of the conspiracy. Austin was standing up in front of him, and shook his finger in his face and told him: 'Uncle Allen, you know you got me into this; and if you say you did not kill that old woman you are just telling a G—d—lie.' He said, 'The first time you mentioned it to me was on Wednesday afternoon out in the woods' (down close to where Allen lived). He said Allen gave him a drink of whisky and told him where he could get some money, and he said he wanted to know where, and he said at the filling-station, and he asked him how much money, and Allen said he did not know but they would get enough to get a new suit of clothes out of it, and he told him: 'Uncle Allen, that is wrong. You know we ought not to do that.' But he said he consented to go with him and make this raid on this station, and he said later they got in a car and rode around

and went back down to where his Uncle Allen lived; and as well as I remember he said he did not know where he stayed that night. He said out in the woods, and that Uncle Allen told him and Homer Padgett, who was in the car Wednesday afternoon, to go up to the Browning filling-station and 'familiarize yourselves with the place, the buildings,' and that he and Homer went up there the next morning, that he bought a can of beans and a loaf of bread and Homer bought a Ike and Mike pie, and that they came up the highway on the right-hand side going north, just about the clay hole, and ate the lunch they bought, and said they came out through the woods and that Homer came on up the highway, and that night just before dark he was over inside the fence where the Hickory Grove road goes into the highway at the four-mile post. He said that Allen, old man Cheney and old man Cheney's son in law were in a Ford car with the top down, and when they drove up and stopped they got over the fence and got in the back seat with Allen; they had a shotgun in the back seat sitting with the butt on the bottom of the car and the barrel back between them; they drove a little piece and picked up Homer, and said that Uncle Allen gave him a bottle of whisky and told him to take a big drink, that he would need it to-night. Said Homer ran down on the running-board of the car till they got near the station, and he got off and went across by the station, and that they all drove down then near the waterway, a little drain on the highway just south of the station. He said they got out and took the gun, and that they all four came walking back up to the station, and said Allen asked him if he would shoot them, and he said he would shoot the old man but by G— he would not shoot the old woman; he said that they walked up close to the station, Cheney nearest to the highway, he next to Cheney, and Allen to the right of him, and he said that he shot the old man through the window and he raised up his fingers this way [indicating] as he pointed the gun, and said he shot him on the right side of the face and head, and said when the old woman screamed he got scared and dropped the gun, that Uncle Allen grabbed it up, and old man Cheney hollered to him not to run, and the old woman jumped up and ran towards the door, and Allen shot her in the body, and said he did not know where. He said she got in the back room, and Allen ran around in front through the front door and around the end of the counter

into the back room. The woman was lying on the bed, and he shot her over the sholder and said 'by G— I reckon that will stop her hollering,' and that when he turned around Travis Ervin was going through Browning's pockets and said when they got out of the building he did not know which way the rest of them went, but him and Uncle Allen went back around the building, and did not know which way the rest went, but he and Uncle Allen went out through the woods. I think they got separated out in the woods, and he stayed in a pond out there until about daylight next morning and he went from there down the highway and caught a ride with some party (I don't remember the name or whether he stated the name or not) to the guards down at camp about where the fruit-fly camp was, and asked them if that was a good place to get a ride, and two men picked him up and carried him to the lower end of the detour, about the Gateway Filling Station, and he got out. He said that Homer was back out below the building, watching; he said that when he fired the gun that he dropped it and started to run, and Cheney told him not to run. He didn't say that Cheney grabbed him; he said that when he dropped the gun and started to run Uncle Allen grabbed it and old man Cheney told him it is too late to run now. He said old man Cheney said, 'Kill them; kill them dead.' Homer made substantially the same statement to Allen on this same occasion, and in giving the details of it he talked about the same thing."

Q. "Now, after this statement was over, I will ask you if there were any further features to the detailed statement that occur to you at this time?" A. "I don't recall it right now. I know when he got through with his statement Allen was standing there with his arms folded, and never affirmed it or denied it. Homer told them how he went around the station where they told him to go, they gave him a drink of liquor when he got up on the car, told him he would need it, and Uncle Allen told him where to get off and watch. He said that he left the car just north of the station and went around the north side of it to the east end of it and went in this direction from the station. He said he was standing there watching for them, and when the first shot was fired and the old woman hollered he quit walking and went over into the woods, and said he heard the second shot and that he was about to run around in the front and go in when he heard the third shot,

and she did not holler any more, and that a few minutes after the last shot was fired he heard the car they came in crank up, and that he went on down through the woods the way he was leaving and came out. He said the car did not wait for him, and that after the cars gathered up there he came back to the edge of the highway, and a man came up in a blue roadster and left his motor running, went to the store, said a good many people had gathered there, and that he told him that his car had left him and he wanted to go to Florida, and this man carried him as far as Archer. Austin did most of the talking on the occasion they confronted Allen in the Thomasville jail. After he, Austin Westberry, stated the circumstances, and after the first statement was made, to wit, 'I killed the old man and you killed the old woman.' and Allen Westberry's denial of this, he, Allen Westberry, did not affirm or deny anything that was said by either of the defendants. He did not make any further denial of that or affirmation of it at any time while he had the other two defendants before him."

John Hough, with reference to the same matter, testified: "I stayed in there a few minutes. When we took Allen out of the cell, one of the gentlemen asked him if he had decided to tell the truth; he said he didn't know anything about it, and Austin spoke up and said, 'Uncle Allen you just as well come on and tell all about it,' and he said 'I don't know anything about it.'" T. O. Sturtevant testified, with reference to the statements made by Austin and Allen Westberry: "Austin was the first one that talked to his Uncle Allen. He started by telling when his Uncle Allen first approached him about getting in on this robbery; at that point Allen says, 'You are lying on me, Austin; and if you stick to this, it is going to put us all in the electric chair. . . I am not going to argue with you boys any more; say just what you please.'" On cross-examination this witness testified: "They made these statements to Allen themselves. I told him that these boys had confessed, 'tell us they have told us truth. I want to know what you are going to say about it.' I said, 'Go ahead and tell it;' and they did. Allen did not tell me that, he told me that he didn't have anything to do with it. He denied it that time by calling Austin a liar. He denied it before we went to Thomasville and told me he did not have anything to do with it and did not know anything about it."

On the trial the alleged confessions of Austin Westberry and Homer Padgett were admitted in evidence over the objection of counsel for Allen Westberry. We are of the opinion that the court erred in admitting in evidence these confessions and in failing to rule out such evidence, on motion, after it was admitted, and in charging the jury thereon. These admissions or confessions were made after the alleged conspiracy had ended, and over the denial of the facts stated, by the defendant; and therefore they were inadmissible as against the defendant. In *Brandon* v. *State,* 169 *Ga.* 808 (151 S. E. 493), it was held: "Acts and declarations of one of the conspirators, made after the enterprise has ended, are admissible only against him, and not against other alleged conspirators." It was therefore error to admit evidence of the alleged confessions of Austin Westberry and Homer Padgett, charging the defendant with guilt in the instant case, and also to submit such alleged confessions to the jury with instructions thereon.

It was error to admit such declarations of Austin Westberry and Homer Padgett, charging the defendant with guilt, on the ground that he was silent and did not deny the accusations, for the reason that the evidence for the State shows that the defendant did in fact distinctly deny his guilt when confronted by Austin Westberry and Homer Padgett, with alleged participation in the homicide. In *Ware* v. *State,* 96 *Ga.* 349 (23 S. E. 410), it was held: "The principle that acquiescence or silence, when the circumstances require an answer or denial, may amount to an admission, has no application to a criminal cause where a person accused by another with the commission of an offense immediately denies all knowledge of, or complicity in, its commission, even though such denial be in general terms and does not in detail extend to each of the minor incriminating circumstances charged against him. Such a case not being one showing silence by the accused under accusation, the court, if any charge with reference to this subject is given, should thereby withdraw entirely from the consideration of the jury the whole subject of implied admissions; and a charge which, under such circumstances, leaves open to their consideration the effect of alleged admissions by silence is erroneous." In delivering the opinion of the court in the *Ware* case Mr. Justice Atkinson said: "But there is no authority for the proposition anywhere, so far as we have been able to discover, that authorizes the circumstance of

acquiescence or silence to be weighed against a person charged with the commission of an offense, when, immediately upon the accusation, he makes a flat denial of any knowledge of or complicity in the offense whatever. Such a denial is a disavowal of the act as his act; and though he may not in detail deny each minor incriminating circumstance which may be charged against him, his general denial is sufficient to exclude the idea of an implied admission. For these reasons, this testimony ought to have been ruled out, but, in the absence of a motion to rule it out, the court, in instructing the jury as to its force and effect, should have withdrawn it absolutely from their consideration: The law does not favor convictions based upon confessions, and least of all, upon implied confessions." And see *Chapman* v. *State,* 109 *Ga.* 157 (34 S. E. 369) ; *Simmons* v. *State,* 115 *Ga.* 574 (41 S. E. 983) ; *Graham* v. *State,* 118 *Ga.* 808 (45 S. E. 615) ; 16 C. J. 634.

As a reversal occurs in this case on the refusal to grant a new trial, no opinion is expressed upon the weight and sufficiency of the evidence to authorize the verdict. The other grounds of the motion for new trial are without substantial merit.

*Judgment reversed. All the Justices concur.*